[J-30-2022] [MO: Donohue, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| MARIE SCOTT, NORMITA JACKSON, MARSHA SCAGGS, REID EVANS, WYATT EVANS, TYREEM RIVERS | : | No. 16 WAP 2021 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court entered May 28, 2021 at No. 397 MD 2020. |
| | : | |
| v. | : | |
| | : | ARGUED: April 13, 2022 |
| | : | |
| PENNSYLVANIA BOARD OF PROBATION AND PAROLE | : | |
| | : | |
| | : | |
| APPEAL OF: MARIE SCOTT, NORMITA JACKSON, MARSHA SCAGGS, TYREEM RIVERS | : | |
| | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                                **DECIDED: OCTOBER 19, 2022**

The Appellants here are challenging the constitutionality of the Prisons and Parole Code ("Parole Code").[1] Because Appellants' underlying judgments of sentence do not prohibit parole consideration, their constitutional challenges to the Parole Code do not threaten to disturb their judgments of sentence. Thus, this is not an action "for a writ of *habeas corpus* or post-conviction relief."[2] The Commonwealth Court therefore had original jurisdiction over Appellants' petition for review.

"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a

---

[1]     61 Pa.C.S. §§ 101-7301.

[2]     42 Pa.C.S. § 761(a)(1)(i).

felony."[3]  A person convicted of second-degree murder "shall be sentenced to a term of life imprisonment."[4]  The Crimes Code does not specify whether "life imprisonment" in this context means life with or without parole.  That contrasts with other crimes, for which the General Assembly explicitly provided for a punishment of life imprisonment *without parole.*[5]

Until this case, the General Assembly's lack of specificity in the homicide sentencing statute has been of little importance because, while that statute is silent regarding parole eligibility, the Parole Code gives the Parole Board the authority to grant parole "except [to] an offender condemned to death or serving life imprisonment[.]"[6]  In addition, because those convicted of second-degree murder and sentenced to life imprisonment do not have a minimum sentence, the Board lacks the power to parole them for that reason alone.[7]  Thus, a defendant convicted of second-degree murder is destined

---

[3]    18 Pa.C.S. § 2502.

[4]    18 Pa.C.S. § 1102(b).

[5]    18 Pa.C.S. § § 3301(b)(1) (providing that a person convicted of a second-degree murder involving arson "shall be sentenced to life imprisonment without right to parole"); 42 Pa.C.S. § 9714(a)(2) (stating that a trial court may sentence a three-strikes violent offender to "life imprisonment without parole" if a minimum sentence of 25 years' imprisonment would not sufficiently protect the public).

[6]    61 Pa.C.S. § 6137(a)(1) (providing that the Board "may release on parole any offender to whom the power to parole is granted to the board by this chapter, except an offender condemned to death or serving life imprisonment").

[7]    61 Pa.C.S. § 6137(a)(3) ("The power to parole granted under this section to the [B]oard may not be exercised in the [B]oard's discretion at any time before, but only after, the expiration of the minimum term of imprisonment fixed by the court in its sentence or by the Board of Pardons in a sentence which has been reduced by commutation.").

to serve life without parole. But the "without parole" part comes *not* from the sentencing statute or the defendant's judgment of sentence, but from the *Parole Code*.[8]

I cannot explain why the General Assembly created such an unusual sentencing scheme for this small group of defendants.[9] But, because it did, Appellants are in a unique situation. They are now able to present constitutional challenges to the Parole Code that could (if they succeed) make them eligible for parole consideration *without disturbing* their underlying judgments of sentence. That's because Appellants are seeking to invalidate Parole Code Subsections 6137(a)(1) (the no-parole-for-lifers provision) and 6137(a)(3) (the minimum-sentence requirement) as applied to persons who did not personally take a life or intend to take a life.[10] Those two statutory provisions are the *only* thing standing between Appellants and parole eligibility, because their judgments of sentence do *not* prohibit parole. This means that the relief Appellants seek

---

[8]     *Hudson v. Pa. Bd. of Prob. & Parole*, 204 A.3d 392, 400 (Pa. 2019) (Wecht, J., concurring) ("The General Assembly's use of the term 'life imprisonment' in both [the sentencing statute and the Parole Code] indicates, plainly and unambiguously, that it intended to ensure that those convicted of second-degree murder are never to be released on parole.").

[9]     The statutes implicated here contain many instances of careless draftsmanship. To give just one example that our Court has called "somewhat confounding," *Hudson*, 204 A.3d at 398, the Sentencing Code states that courts may impose a sentence of imprisonment without parole only in certain specified circumstances, but a life sentence for second-degree murder is not one of the allowed circumstances, even though trial judges are required by statute to sentence second-degree murderers to life imprisonment with no specified minimum sentence. 42 Pa.C.S. §§ 9756(c)-(c.1).

[10]     Brief for Appellants at 15 ("By virtue of the Board's enforcement of § 6137(a)(1), Appellants are denied a meaningful opportunity for release from prison. Appellants claim that this denial violates the cruel punishments clause at Article I, § 13 of the Pennsylvania Constitution for individuals, like Appellants, who did not take a life or intend to take a life."); *id.* at 34 (arguing that, if Subsection 6137(a) is found to be unconstitutional, "the statutory provision requiring that an incarcerated person not be considered for parole until their minimum sentence is served, 61 Pa.C.S. § 6137(a)(3), would also have to be nullified in relation to everyone serving life sentences because of an identical constitutional analysis").

is not "in the nature of [an] application[n] for a writ of *habeas corpus* or post-conviction relief."[11]  The Commonwealth Court therefore had original jurisdiction over Appellants' petition for review.

This state of affairs could perhaps fairly be called a loophole.  But it is the natural consequence of the unambiguous statutory scheme that the General Assembly chose to enact.  The General Assembly could have instructed courts to sentence all persons convicted of second-degree murder to life without parole.  But it did not do so.  Instead, it created two distinct punishments: life imprisonment and life imprisonment without parole.  Those sentenced to life imprisonment without parole are ineligible for parole (obviously) because their judgments of sentence expressly preclude it.  Persons sentenced to life imprisonment are also ineligible for parole, but only because the Board lacks the statutory authority to parole them, *not* because their judgments of sentence prohibit them from serving some portion of their life sentence on parole.

Purporting to evaluate this case as "a matter of statutory interpretation," my learned colleagues in the Majority somehow conclude that Appellants' judgments of sentence prohibit parole.  This is not what the Crimes Code says.[12]  Under Subsection 1102(b), "life imprisonment" was the only sentence that Appellants' sentencing judges were allowed to impose.[13]  Apparently undeterred by the unambiguous text of the sentencing statute, the

---

[11]     42 Pa.C.S. § 761(a)(1)(i) (providing that the Commonwealth Court does not have original jurisdiction over "actions or proceedings in the nature of applications for a writ of *habeas corpus* or post-conviction relief not ancillary to proceedings within the appellate jurisdiction of the court").

[12]     *Compare* Majority Opinion at 26 (stating that "parole ineligibility [is] a part of the sentence itself" for second-degree murder convictions), *with* 18 Pa.C.S. § 1102(b) (stating that "a person who has been convicted of murder of the second degree . . . shall be sentenced to a term of life imprisonment," with no mention at all of parole eligibility or ineligibility).

[13]     18 Pa.C.S. § 1102(b).

Majority simply calls it "absurd" and then refuses to enforce it.[14] As an interpretive matter, the Majority's conclusion that Appellants are serving sentences of life without parole is groundless. Indeed, the Majority itself admits that it is imposing today's holding "*regardless* of the statutory language contained within the underlying crime or other sentencing statutes."[15] This is a startling admission indeed, and not one that we encounter often in a judicial opinion.[16]

Besides ignoring clear statutory language, the Majority also muddies the very definition of a sentence. While readers of today's opinion likely understand a judgment of sentence to mean an order issued by a sentencing court imposing a specific sentence pursuant to a specific sentencing statute, the Majority's understanding of a "sentence" is something far more nebulous.[17] In the Majority's telling, provisions of the Parole Code that govern the powers of the Parole Board are somehow "best described as part of the judgment of sentence."[18] This is a remarkable innovation, one at which the Majority arrives only by mischaracterizing our holding in *Hudson v. Pennsylvania Board of Probation & Parole,* 204 A.3d 392 (Pa. 2019).

---

[14] Majority Opinion at 23. The Majority even speculates in a footnote that it might be unconstitutional for the General Assembly to provide for a sentence of "life imprisonment" for some offenses while also providing for a sentence of "life imprisonment without right to parole" for others. The Majority does not explain which constitutional provision (or which Constitution) even arguably prevents the General Assembly from imposing different punishments for different crimes. *Id.* at 23 n.9.

[15] *Id.* at 23 (emphasis added; footnote omitted).

[16] *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

[17] *Sentencing Order*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "sentencing order" to mean "[a] judicial order that identifies the issuing court, the offender, the offense underlying a conviction, the sentence imposed, and any special conditions or options that affect the sentence.—Also termed judgment of sentence; judgment-of-sentence order").

[18] Majority Opinion at 22.

The appellant in *Hudson* was a *pro se* prisoner serving a sentence of life imprisonment for second-degree murder. Before our Court, Hudson offered a fairly strained statutory interpretation argument. He claimed that trial courts sentencing second-degree murderers to life imprisonment are required by Subsection 9756(b)(1) of the Sentencing Code[19] to impose a minimum sentence, and that the trial court's failure to impose a minimum sentence in his case meant that he should be presumed to have a minimum sentence of only one day. Unsurprisingly, we rejected that argument. We explained that, "[u]nder [a]ppellant's theory, in the case of second-degree murder[,] sentencing courts should impose a minimum sentence no greater than one-half of the mandated life sentence. This, however, would be 'impossible of execution' because a sentencing court cannot know, at the time of sentencing, the number of years the defendant will continue to live."[20] We also rejected the argument that a minimum sentence of one day should be presumed, noting that "life sentences are reserved for the most serious crimes," and that, elsewhere in the Crimes Code, the General Assembly manifested its ability and intent explicitly to pair minimum sentences with maximum sentences of life imprisonment.[21]

Emphasizing that our opinion in *Hudson* "concluded that the General Assembly did not intend for a trial judge to impose a minimum sentence when imposing a sentence of life imprisonment," the Majority suggests that "[t]his represents a holding that the General Assembly intended that for all offenders who are sentenced to life imprisonment,

---

[19]    42 Pa.C.S. § 9756(b)(1) (providing that trial courts "shall impose a minimum sentence of confinement which shall not exceed one-half of the maximum sentence imposed").

[20]    *Hudson*, 204 A.3d at 397.

[21]    *Id.* (citing 18 Pa.C.S. § 1102.1(a)(1), which provides for a sentence of "35 years to life").

ineligibility for parole is a part of their sentence."[22] That's simply not the case. While we concluded that Hudson was ineligible for parole, we never said that he was ineligible *because of his judgment of sentence.* Indeed, as the Majority admits, the jurisdictional question of whether Hudson's parole ineligibility was part of his judgment of sentence—and thus subject to challenge only under the Post Conviction Relief Act—was neither raised nor decided in *Hudson.*[23]

Furthermore, our analysis in *Hudson* went well beyond the homicide sentencing statute and Hudson's judgment of sentence. We also noted that the Parole Code prohibits the Board from paroling prisoners before their minimum sentences have expired, and that the Board is also prohibited from paroling a prisoner serving a sentence of life imprisonment.[24] Hence, our bottom-line conclusion in *Hudson* was not, as the Majority seems to suggest, that Hudson's judgment of sentence rendered him ineligible for parole. Rather, we concluded that "the Board lacks the power to release on parole an inmate serving a mandatory life sentence for second-degree murder," and that Subsection 9756(b)(1) of the Sentencing Code "was never intended specifically to create a personal right to be reviewed for parole."[25]

I agree with the Majority on one thing: the General Assembly plainly did intend to prevent those serving sentences of life imprisonment from being released on parole. But the Majority ignores the means that the legislature chose to accomplish that outcome.

_____

[22] Majority Opinion at 21.

[23] *See id.* at 16 ("In retrospect, a discussion of jurisdiction in *Hudson* would have been useful[.]").

[24] *Hudson*, 204 A.3d at 398 (discussing *Castle v. Pa. Bd. of Prob. & Parole*, 554 A.2d 625, 628-29 (Pa. Cmwlth. 1989)).

[25] *Id.* at 399 (footnote omitted).

The General Assembly did not make the sentence for second-degree murder life imprisonment without parole, as the Majority pretends. Instead, parole consideration for those serving a sentence of "life imprisonment" is a function of the Parole Code, completely divorced from the defendant's underlying judgment of sentence.[26] So even if Appellants' constitutional challenges succeeded, their judgments of sentence would remain intact and they unquestionably would remain in the custody of the Department of Corrections until their deaths.[27] It is a mystery to me how Appellants' claims could be

---

[26] As I explained in my concurrence in *Hudson*, to conclude that the General Assembly intended to prohibit parole for those serving life imprisonment, one must look both at the sentencing statute and at the Parole Code:

> Our Crimes Code mandates that any person convicted of second-degree murder be sentenced "to a term of life imprisonment." 18 Pa.C.S. § 1102(b). Subsection 6137(a) affords the parole board the discretion to release any inmate on parole "except an inmate condemned to death or serving life imprisonment." 61 Pa.C.S. § 6137(a)(1). The General Assembly's use of the term "life imprisonment" in both of these provisions indicates, plainly and unambiguously, that it intended to ensure that those convicted of second-degree murder are never to be released on parole.

*Hudson*, 204 A.3d at 400 (Wecht, J., concurring).

[27] As we explained in a case upholding the constitutionality of the modern parole system, "[parole] is not an act of clemency, but a penological measure for the disciplinary treatment of prisoners who seem capable of rehabilitation outside of prison walls. *It does not set aside or affect the sentence*; the convict remains in the legal custody of the state and under the control of its agents, subject at any time, for breach of condition, to be returned to the penal institution. *Com. ex rel. Banks v. Cain*, 28 A.2d 897, 899 (Pa. 1942) (emphasis added). *See also Commonwealth v. Brittingham*, 275 A.2d 83, 85 (Pa. 1971) ("The prisoner on parole is still in the legal custody of the state through the warden of the institution from which he was paroled, and is under the control of the warden and of other agents of the Commonwealth until expiration of the term of his sentence."); *Com. ex rel. Sparks v. Russell*, 169 A.2d 884, 885 (Pa. 1961) ("[Parole] does not set aside or affect the sentence and the convict remains in the legal custody of the state. . . . A prisoner on parole is still in the legal custody of the warden of the institution from which he was paroled and he is under the control of the warden until the expiration of the term of his sentence.").

deemed legality of sentence challenges when Appellants do not even seek vacatur of their judgments of sentence.

Every year, Pennsylvania courts receive hundreds of petitions seeking to obtain collateral relief beyond and notwithstanding the exclusive jurisdiction of the Post Conviction Relief Act. As a result, it is unsurprising that a judicial instinct to police the PCRA's jurisdictional bounds rigorously can develop. No doubt acting on that impulse, the Majority and the Commonwealth Court dismiss Appellants' arguments as creative lawyering gone too far.[28] But Appellants are merely offering a natural reading of the strange statutory scheme that the General Assembly (for whatever reason) chose to enact. It is the Majority's argument—which ignores the statutory text and treats Appellants' constitutional challenges to the Parole Code as collateral attacks on their judgments of sentence—that is the creative one.

Those who might otherwise be inclined to favor today's expansion of the PCRA's jurisdiction on policy grounds would be wise to pause to first consider the unintended consequences that the Majority's flawed legal reasoning likely will have. Many vexing policy issues surround Pennsylvania's treatment of second-degree murderers. The Majority's blurring of the distinction between a judgment of sentence and the Parole Code will make any attempt to address those issues much harder for the policymaking branches in the years to come. The following brief history of life sentences in Pennsylvania will show just how short-sighted today's decision is.

---

[28] Majority Opinion at 20 (calling the Appellants' argument "creative"); *id.* at 30 n.12 ("[T]he General Assembly did not intend to permit an end-run around the [PCRA's] time-bar through creative pleading."); *Scott v. Pa. Bd. of Prob. & Parole*, 256 A.3d 483, 492 (Pa. Cmwlth. 2021) (stating that the court "will not countenance" the Appellants' "thinly veiled attempt to forum shop through pleading"); *see also* Majority Opinion at 17 (expressing concerns about "creative plaintiffs" and "artful pleading").

Even after the creation of Pennsylvania's first parole system in the early 1900s, the Governor and his Board of Pardons "retained power to reduce minimum sentences and release prisoners at any time."[29] This power proved especially useful and was often exercised in cases involving "long or life sentences."[30] After a 1939 report commissioned by the Governor recommended "formally separating pardons from parole,"[31] the General Assembly took that advice and passed the Parole Act of 1941. This legislation created an independent Parole Board with authority over prisoners, but it also precluded that body from paroling "convicts condemned to death or serving life imprisonment."[32] Thus, the legislation created a clear division of labor, with the Governor—rather than the Parole Board—possessing the "exclusive responsibility to decide on commutation for life-sentenced prisoners."[33]

Ultimately, the question of which body had the power to exercise clemency in second-degree murder cases made little difference to those serving "life imprisonment," since Pennsylvania's various governors all used their commutation powers liberally throughout the middle part of the twentieth century.[34] To quote one legislator who described the state of affairs in this era: "In the year 1954, life imprisonment in Pennsylvania meant that a prisoner had to serve 19.6 years in the penitentiary . . . in

---

[29] Christopher Seeds, *Governors and Prisoners: The Death of Clemency and the Making of Life Sentences without Release in Pennsylvania*, Vol. 46 SOCIAL JUSTICE No. 4, at 86 (2019).

[30] *Id.* at 86-87.

[31] *Id.* at 87.

[32] *Id.*

[33] *Id.* at 88

[34] *Id.* at 87 (stating that "[c]ommutation for lifers was regular" from the 1930s through the 1970s).

1958, it meant that he had to serve 17.2. . . . This is what life imprisonment means."[35] Liberal use of the commutation power continued well into the 1970s, with one legislator declaring in 1973 that "a sentence of life imprisonment" in Pennsylvania is "not necessarily a sentence of life imprisonment."[36] Indeed, "[h]earings show that lawmakers anticipated that prisoners convicted of second-degree murder would have [their] sentences commuted and would be released after a period of roughly 20 years."[37]

"In light of Pennsylvania's historically active clemency practice, the absence of parole was not, initially, a substantial concern."[38] By the 1980s, however, clemency fell into disuse. Governor Thornburgh, who took office in 1979, approved fewer than 10 percent of the recommendations for commutation that he received[.]"[39] This trend continued until commutations became vanishingly rare. Between 1990 and 1993, only eleven prisoners had their sentences commuted in Pennsylvania, while the State of Texas, for instance, granted nearly 500 commutations during that same three-year period.[40]

---

[35] *Id.* at 88 (quoting Leg. Journal, Gen. Assemb. 38-70, 145th Sess., at 2694 (Pa. 1961)).

[36] *Id.* at 93 (quoting Leg. Journal, Gen. Assemb. 1-30, 157th Sess., at 775 (Pa. 1973)); *id.* at 89 (quoting a letter from the Superintendent of the Western State Penitentiary to Governor Shapp stating that "the average lifer serves approximately 18 years before his sentence is commuted and he is paroled to the community").

[37] *Id.*

[38] *Id.* at 94.

[39] *Id.* ("Between 1979 and 1986, [Governor] Thornburgh granted fewer commutations than [Governor] Shapp ever granted in a single year").

[40] *Id.* at 96. Legal scholars cite several possible causes for this decrease in commutations, including "increased political influence [on] commutation decisions," *id.* at 94, "[h]igh-profile events and political debate in the 1990s," *id.* at 95, "aggressive restructuring of the board of pardons," *id.*, and "an amendment to the state Constitution

As commutations evaporated, and life imprisonment actually started to mean life imprisonment, legislative efforts began to shift toward making lifers parole-eligible. Such a legislative change is possible only because, as I have explained, *parole ineligibility for those serving a sentence of life imprisonment comes not from the defendant's judgment of sentence, but from the Parole Code.* And the General Assembly can modify the Parole Code by passing legislation that makes those serving life sentences eligible for parole after a set number of years.[41]

In fact, there have been many legislative proposals to do just that over the years. One bill introduced in 1992 (HB 1382) would have made inmates serving life sentences eligible for parole.[42] Although that measure never became law, similar legislation is being considered in the Senate today. Two different bipartisan bills (SB 835 and SB 135) would amend the Parole Code to allow the Board to parole some second-degree murderers who have served at least twenty-five years in prison.[43] And those proposals are essentially modified versions of similar bills from the prior legislative session.[44] Consider this: It is

---

concerning the membership and decision-making of the board[, which] structurally altered the way clemency was issued." *Id.*

[41]    The Majority ignores this key detail when it incorrectly surmises from the Parole Code a "legislative intent to *forever* bar parole eligibility for all individuals convicted of second-degree murder." Majority Opinion at 22 (emphasis added).

[42]    Seeds, *supra*, note 9, at 96.

[43]    S.B. 835, Printer's No. 1029, Reg. Sess. (Pa. 2021); S.B. 135, Printer's No. 250, Reg. Sess. (Pa. 2021); *See* Peter Hall, *Former 'lifers' call on lawmakers to end 'death by incarceration',* PENN. CAPITAL-STAR (Sept. 20, 2022), https://www.penncapital-star.com/civil-rights-social-justice/former-lifers-call-on-lawmakers-to-end-death-by-incarceration; *see also* Ryan Deto, *Bipartisan bill aims to allow Pa. lifers a chance at parole,* PENN. CAPITAL-STAR (Nov. 15, 2021), https://www.penncapital-star.com/civil-rights-social-justice/bipartisan-bill-aims-to-allow-pa-lifers-a-chance-at-parole.

[44]    S.B. 942, Printer's No. 1366, Reg. Sess. (Pa. 2019); H.B. 135, Printer's No. 1708, Reg. Sess. (Pa. 2019).

highly questionable—at best—whether such bills would have any legal effect following the Majority's decision today.

The policy considerations that our sister branches will have to weigh in this arena are many. For one thing, life imprisonment means something very different than it did many decades ago, when commutations were frequent and parole eligibility was not even a concern. Another consideration is that the share of prisoners serving life sentences in Pennsylvania has ballooned to the point where "[l]ifers now account for roughly 10 percent of Pennsylvania's prison population, the highest rate in the country."[45] Of those inmates, roughly 1,100 of them are second-degree murder convicts, many of whom did not intentionally kill anyone.[46] Plus, policymakers likely will need to consider the high costs associated with caring for an increasingly geriatric prison population,[47] and must no doubt weigh any potential cost savings from expanded parole availability against any increased risk to public safety. (Keeping in mind, of course, that the risk of recidivism generally decreases with the age of the offender.)

It is not for me or for this Court to decide whether statutory changes should be made in this complex area of law. What I do know, though, is that any future legislative reforms will now be hamstrung by the Majority's newly invented legal fiction that those serving sentences of life imprisonment are precluded from receiving parole *because of their judgments of sentence*. By folding parole ineligibility into the judgment of sentence

---

[45]     Brief for the Defender Association of Philadelphia at 22.

[46]     Brief for the Sentencing Project at 2.

[47]     *Id.* at 27 (explaining that almost half of Pennsylvania's inmates serving life sentences for second-degree murder "are 50 or older" and "nearly 60 percent have already served over 20 years" in prison); *see* Deto, *supra*, note 44 ("[T]he Department of Corrections has estimated the cost for personal care is nearly $500 per day per person, and that most individuals under personal care are incapacitated and not threatening to society at all.").

itself—where the General Assembly did not put it—the Majority seemingly eliminates the General Assembly's ability to expand parole eligibility to lifers with a simple change to the Parole Code, at least without formal resentencing or some other form of judicial involvement.

My point here is that today's decision unapologetically ignoring the text of the governing statutes is not simply harmless jurisdictional gatekeeping. The Majority's decision will also have very real and regrettable consequences for future policy reforms that have been brewing for decades.

I respectfully dissent.